Filed 4/1/26  Hussey v. Paramount Pictures Corp. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| OLIVIA HUSSEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PARAMOUNT PICTURES CORP. et al., <br><br> Defendants and Respondents. | B343066 <br><br> (Los Angeles County Super. Ct. No. 24STCV03814) |

APPEAL from an order of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed.

Zishan Lokhandwala for Plaintiffs and Appellants.

Kendall Brill & Kelly, Richard B. Kendall, Nary Kim, and Tiana S. Baheri for Defendant and Respondent Paramount Pictures Corp.

Ullman, Furhman & Platt and Jeffrey D. Ullman for Defendants and Respondents The Criterion Collection and Janus Films.

————————————————

Appellants Leonard Whiting and Olivia Hussey starred as the titular characters in the 1968 film Romeo and Juliet, directed by Franco Zeffirelli.[1]  The film contains a "bedroom scene" in which both appellants appeared partially nude—Whiting's buttocks and Hussey's breasts are visible.  Appellants admit they consented to the use of this footage in the finished film but insist that consent was conditioned on the footage being used in a manner approved by Zeffirelli.  Appellants agree the 1968 film met this condition.

In their operative complaint, appellants allege that, in February 2023, respondent Paramount Pictures Corporation authorized respondent Janus Films, LLC (through its "wholly owned subsidiary" respondent Criterion Collections, Inc.)[2] to release a version of the film that digitally enhances the bedroom

---

[1] In January 2026, appellants moved to substitute David Glen Eisley—Hussey's husband and successor in interest pursuant to California Rules of Court, rule 8.36(a) and Code of Civil Procedure sections 377.20, 377.30, 377.31, and 377.32—in place of Hussey, as Hussey passed away in December 2024.  Respondents filed no written opposition and, when asked at oral argument, stated their only potential objection to the motion would be on the grounds of timeliness (notwithstanding the lack of any express timing requirement in the relevant statutes), and conceded they suffered no prejudice from the motion's alleged untimeliness.  We grant the motion.  For the sake of brevity, we still refer herein to Hussey and Whiting as "appellants."

[2] Respondents contend "Criterion is not and never was a partner in Janus, and Janus is not and never was a shareholder, let alone the sole shareholder, of Criterion."  Because we affirm the trial court's order in this appeal, we need not address this issue.

scene in a way that Hussey later contended transformed an "intimate love scene" into "lewd and lascivious conduct."

Respondents filed a motion to strike the operative complaint pursuant to Code of Civil Procedure section 425.16 (the anti-SLAPP motion), submitting evidence that in 2023, Criterion released a Blu-ray Disc and a standard DVD, both of which contained the same content as the 1968 film and were of no higher resolution than previous versions of the film. The trial court granted the motion, concluding appellants could not demonstrate they did not consent to the 2023 Criterion releases.

On appeal, appellants contend the trial court erred because: (a) it improperly weighed evidence respondents submitted in support of their motion against evidence appellants submitted in opposition thereto; (b) it should have followed the "judicial trend" of denying anti-SLAPP motions involving alleged use of personal images; and (c) it used an incorrect standard to evaluate whether appellants consented to the 2023 Criterion releases. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Appellants' Previous Lawsuit*

In December 2022, appellants filed a form complaint against Paramount. The complaint alleged that when the appellants were cast in the lead roles of the 1968 film Romeo and Juliet, director Zeffirelli (Paramount's "authorized agent") assured them "there would be no nudity filmed or exhibited, and that Plaintiffs would be wearing flesh colored undergarments during the bedroom/love scene." However, on the day that scene was shot, Zeffirelli informed appellants "they must act in the nude or the Picture would fail," and they "would never work

3

again in any profession, let alone Hollywood." Zeffirelli showed appellants where the cameras would be positioned "so that no nudity would be filmed or photographed for use in Romeo & Juliet or anywhere else." Appellants believed they had no choice but to agree. Contrary to his assurances, Zeffirelli secretly filmed appellants while they were "nude or partially nude" and used this footage in the film.

Based on these allegations, appellants brought claims for: (1) sexual harassment; (2) fraud; (3) sexual abuse; (4) appropriation of name and likeness; (5) intentional infliction of emotional distress; (6) negligence; and (7) unfair business practices under Business and Professions Code section 17200.

Paramount filed an anti-SLAPP motion, which the superior court (Judge Alison Mackenzie) granted in May 2023. The court found that appellants' "claims in this action stem from Defendant's alleged involvement in the production and distribution of the Romeo & Juliet film" and that "the production and distribution of a film constitute protected activity under the First Amendment." The court then found the allegations barred by the statute of limitations and struck the complaint, ending the case.

## B. *The Court Strikes Appellants' New Complaint*

### 1. Appellants File a New Lawsuit

In February 2024, appellants filed a new complaint against Paramount as well as Criterion and Janus. In March 2024, they filed an amended complaint (the operative complaint).

4

### (a) Appellants Agree to Star in the Film

In the new lawsuit, appellants again alleged they were cast in the lead roles of the 1968 film Romeo and Juliet (the "Original Work"), but added that Hussey had signed a written contract with non-party British Home Entertainment Productions (BHE) (of whom Paramount was the "assignee, financier, and/or partner") to perform in the movie. Nothing in this contract indicated Hussey would have to perform "immodestly without clothing" or required her to do so. Nor did the agreement give BHE the right "to recreate, republish, or redistribute photographs of her performance in the Original Work in any other medium or format than 35 mm analogue cinematographic photographs." While Whiting did not enter into an agreement with BHE, he also never agreed BHE (or any other entity) had the right "to recreate, republish, or redistribute photographs of his performance in the Original Work in any other medium or format than 35 mm analogue cinematographic photographs."

### (b) Zeffirelli Surreptitiously Has Photos Taken of Appellants While They Are Nude

BHE additionally entered a contract with Franco Zeffirelli "as an independent contractor to provide artistic and editorial control over the Original Work." During filming, Zeffirelli demanded appellants perform a scene without clothing but expressly promised "that no photographs would be taken of their naked bodies other than when they were completely covered by bedclothes and that no photographs of them simulating intercourse would ever be included in the Original Work." He also expressly promised "they would not be photographed in any way to reveal their private parts, that all photographs taken of

their performance simulating sexual intercourse would be [*sic*] never be viewed by anyone not admitted to the closed set for the photographic session, and that no photograph of their exposed private areas, or their performance of an act of simulated intercourse would ever be used in the Original Work."

"Following the photography and with the representation by Zeffirelli that photography had concluded, during a period of ribaldry engaged in to dispel the nervous tension engendered by being required to perform without clothing, [appellants] also simulated an act of intercourse with Whiting mounted on Hussey." During this simulation, "[p]hotographs of Hussey's and Whiting's private, intimate areas were taken by a concealed camera." Appellants deemed these photographs the "Objectionable Photos." As appellants believed no photographs were being taken, "Whiting exposed his naked buttocks outside the bedclothes and Hussey emerged from under the bedclothes briefly exposing her breasts completely including the aureoles and nipples."

### (c) Appellants Consent to the Use of the Objectionable Photos in the Film

In 1967 and 1968, BHE assigned its rights in the Original Work to Paramount for a dollar.

Without appellants' consent, the Objectionable Photos were included "gratuitously" in the Original Work "to appeal to the prurient interests of the audience."[3] However, appellants

---

[3] Appellants do not explain what it means to have photographs inserted into a film. We interpret appellants' allegations as that film footage containing their partially nude bodies was inserted into the film.

6

"acquiesced" to this inclusion because "the copies of the Original Work were not digitally enhanced and the Objectionable Photos contained in the copies of the Original Work that were publicly distributed and displayed were of such extremely low resolution because they were made with very rudimentary image copying technology available at the time that Hussey's and Whiting's private areas shown in those photographs were so obscured as to render them subdued in contrast to the rest of the Original Work and not hostile to the artistic purpose of the original work." "The extremely low resolution of the presentation of their performance in the Original Work was not of such egregious detail as to cause Hussey and Whiting to challenge Paramount's right to distribute it."

Appellants' acquiescence "continued until Hussey and Whiting became convinced, as a result of a major change in societal norms popularly known as the '#Me Too Movement' that they had been victims of Zeffirelli's 'grooming' of them as illicit targets of his sexual proclivities while they were minors and began to believe that the 'ambience of the film' excuse given by Zeffirelli for his insistence that they perform without clothing was not a creature of his genuine artistic conceit, but rather of his sexual desire." Appellants thus filed their initial lawsuit, which the court ultimately found lacked minimal merit due to it being barred by the statute of limitations.

### (d) Appellants Object to a Digital Release with Higher Resolution

In February 2023, without appellants' consent, "Paramount authorized and caused by agreement with Defendant Janus through its wholly owned subsidiary Criterion the publication and distribution of a digital motion picture ('Digital Release')

7

which was a digital, computer created rendition of the Original Work that includ[ed] the Objectionable Photos with extremely vivid digital enhancement." "The Digital Release contained digitally enhanced photographs of Whiting and Hussey lying together in the nude in a bed portraying a newly married couple who had just consummated their marriage with a session of coitus. It also contained computer created, digitally enhanced photographs of the aureoles and nipples of Hussey's naked breasts as well as other material from the Digital Objectionable Photos." "Among other things, the Digital Objectionable Photos rendered, in extremely high definition and detail, the contents of the Objectionable Photos."

When appellants filed their previous lawsuit, they were unaware that Paramount and Janus were intending to release and distribute (or had released and distributed) through Criterion the Digital Release containing the Objectionable Photos. Subsequently, appellants "were made aware thereby that the obscured depiction of their naked buttocks and breasts in the publicly distributed copies of the Original Work had been digitally enhanced such that, unlike the Original Work, the Digital Release depicted their private areas in such high detail that the gratuitous display was lewd and lascivious and demeaning to them." Appellants "became concerned that the Digital Release containing the digitally enhanced Objectionable Photos ('Digital Objectionable Photos') could wreak havoc upon their professional reputations and subject them to critical obloquy and professional ridicule and contempt." But when they demanded Paramount cease and desist from publishing the Digital Objectionable Photos or the Digital Release containing the Digital Photos, Paramount "failed and/or refused."

## (e)    Damages and Causes of Action

As a result of respondents' actions, appellants "were injured in their economic ability to receive compensation for their performances as serious film actors because by their publication and distribution, the Digital Objectionable Photos falsely portrayed them as willing participants in the purveyance of prurient abuse of youthful pulchritude in the service of monetary gain and rendered them the subject of ridicule and obloquy rather than respect and praise for their virtuoso performances."  They also suffered "emotional distress, embarrassment, humiliation, and mental anguish."

Based on these allegations, appellants brought claims for: (1) Unlawful Distribution of Intimate Photographs; (2) Unlawful Use of Likeness; (3) Violation of Performers Rights Act of the United Kingdom; (4) Violation of Civil Code section 1708.85, subdivision (a);[4] and (5) Violation of 15 United States Code section 6851(b).[5]

---

[4] (Civ. Code, § 1708.85, subd. (a) ["A private cause of action lies against a person who intentionally distributes by any means a photograph, film, videotape, recording, or any other reproduction of another, without the other's consent, if (1) the person knew, or reasonably should have known, that the other person had a reasonable expectation that the material would remain private, (2) the distributed material exposes an intimate body part of the other person, or shows the other person engaging in an act of intercourse, oral copulation, sodomy, or other act of sexual penetration, and (3) the other person suffers general or special damages as described in Section 48a"].)

[5] Title 15 United States Code section 6851 is entitled "Civil action relating to disclosure of intimate images."

9

### 2. Respondents Move to Strike the Amended Complaint

In May 2024, respondents filed an anti-SLAPP motion. Arguing issue preclusion based on the previous granting of an anti-SLAPP motion, respondents contended it was a "foregone conclusion" that they met their burden to show the alleged wrongdoing was protected conduct.

As to the merits of the action, among other arguments, they contended appellants' third cause of action (Violation of Performers Rights Act of the United Kingdom) failed because that statute had been repealed before the acts complained of in the operative complaint, and appellants' other claims failed both because the version of the film complained about was of no higher resolution than previous versions, and because appellants both explicitly and implicitly consented to the later releases of the film.

### (a) The 2023 Criterion Releases Are of No Higher Resolution Than Previous Versions

Respondents submitted a declaration from Paramount's senior vice president of archives who oversees the Paramount team "responsible for the remastering, preservation, and restoration of the motion picture films" in the Paramount library. She stated that each "restoration" of the original 1968 film "attempts to bring the Film's quality closer to the original that was displayed in movie theaters back in 1968. However, the Film as exhibited in movie theaters in 1968 remains the high watermark [*sic*] for picture quality and visual clarity."

10

In 1996, "a high definition ('HD') master of the Film in a 1920 x 1080 resolution . . . was created from a 35mm interpositive film."[6]

In 2007, a new 1920 x 1080 master was created from the 1996 HD master, using a 1080p specification, "which continues to be the standard for HD distribution today."[7]

In 2016, Paramount "completed a restoration of the Film from the original 35mm film negative, resulting in the creation of an ultra high-definition ('UHD') master in 4K video resolution (4K UHD)," which "was then used to create a 4K UHD Digital Cinema Package ('DCP') version of the 4K UHD master for purposes of exhibiting the Film in the 4K UHD format in movie

---

[6] Paramount's senior vice president of legal affairs added that this 1996 master was used to create a "standard-definition . . . master," with a 720 x 480 resolution, to "support a DVD release of the Film, which debuted in the United States in 2000."

[7] Paramount's executive vice president of legal affairs declared that "[f]rom 2007 to the present, the 2007 HD master has been used for distribution to television broadcasters, cable and satellite television services, as well as video-on-demand services and streaming platforms, and other forms of digital distribution. Since 2007, [Paramount] has entered into hundreds of licenses for the Film, including to Netflix, Amazon, Apple and Google, and the 1080p version of the Film has been continuously available to the public since that time."

Paramount's senior vice president of legal affairs added that in 2013, Paramount's "affiliates and licensees released the Film in the Blu-ray disc format, which was created using the 2007 HD master and sold in international markets." He additionally explained that "[a] Blu-ray disc, no matter whether derived from a 2K HD master or a 4K UHD master, is limited to 1920 x 1080 resolution."

theaters."[8] "During the restoration process, [Paramount] also created an HD 1080p preservation master for archival purposes."

Paramount's senior vice president of legal affairs explained that Paramount delivered a copy of the HD 1080p preservation master—with a resolution of 1920 x 1080 pixels—to Criterion, and that Criterion used this master to create a Blu-ray copy (with the same resolution) and a standard DVD copy (with a lower resolution). Criterion's quality control and restoration manager confirmed in his declaration that "[t]he file which Paramount provided [Criterion] was in 'HD' or 'high definition format,' about one-quarter the resolution of the 4K version from which it apparently had been derived, and thus displayed reduced technical quality/pixel count as compared to the 4K version. This 'step-down' in resolution was necessary to accommodate the lower end technical specifications for DVD and Blu-ray, which are both significantly lower in resolution than 4K."

Criterion "removed dirt and chemical stains, artifacts of age and wear on the original film materials from which the 4K version had been made and from which the HD file we received had been derived" and "slightly darkened the overall image to make it suitable for home video viewing." But Criterion "did not edit, alter, add or delete scenes or parts of any scene or scenes from 'Romeo and Juliet' in any way at any time." Nor did Criterion "enhance, sharpen or otherwise affect the content or resolution any element or scene in the work." Criterion's chief executive officer confirmed that the "Criterion Releases contain no 'computer generated, digitally enhanced' images, as plaintiffs

---

[8] Respondents submitted evidence that 4K refers to a resolution of 3840 x 2160 pixels.

12

allege.  Nothing has been added or deleted, or 'enhanced' in some way.  No scene or sequence has been modified or altered in any way.  No part of the work has been edited to add or remove content.  Nor is any part of the 4K Version rendered in the Criterion Releases 'in extreme[] high definition and detail,' as plaintiffs also falsely allege; indeed, the Releases are each rendered in significantly reduced resolution from the 4K master from which they were derived, but are otherwise faithful reproductions of the same in all respects."  In February 2023, Criterion released both the DVD and Blu-ray versions of the film.

Along with their motion to strike, respondents asked the court to judicially notice three versions of the film: (1) the 2000 domestic home-video release of the film on DVD; (2) the 2013 international home-video release of the film on Blu-Ray; and (3) Criterion's 2023 release of the film on Blu-ray.[9]

### (b)   Appellants Expressly Consented to Inclusion of the Objectionable Photos

Respondents also attached a copy of Hussey's contract with BHE in which she, through her legal guardian, agreed:  "The Company will have the right to record products of the Artist's services hereunder and to include the same in the said Film and to use the same for the purposes of exploitation advertising etc. by any and all means and by all media and for any other purposes the Company will require."  Respondents proffered evidence that, although they could not find the agreement itself

---

[9] The record discloses no objections to the request for judicial notice.

after so many years, BHE entered into a similar agreement with Whiting.

### (c) Appellants Impliedly Consented to the Later Releases of the Film

In December 2016, appellants attended a screening of the 2016 4K UHD DCP at the Santa Monica Aero Theatre.  In October 2018, Vanity Fair published an article about the movie, stating that Hussey characterized the "bedroom scene" as "tastefully" shot and "needed for the film."  She stated, "Everyone thinks they were so young they probably didn't realize what they were doing."  "But we were very aware.  We both came from drama schools and when you work, you take your work very seriously."

In 2019, Hussey appeared on a podcast in which she explained that when she showed up on set to shoot the bedroom scene, Zeffirelli told her, "You know darling, this is the one and only night they spend together.  They're young, this is their passion.  What would it look like if she takes her robe off and she has her underwear on?"  Hussey continued, "By the time he'd finished telling me about the love thing, I'd go 'Oh.'  And I'd just take everything off and I just got into the bed, because it made sense to me."

In a 2021 interview at a Shakespeare Festival, Hussey declared, "The most fun scene was the bedroom scene because we were very young, and you know we had a crush on each other.  And Leonard [Whiting] wasn't shy at all, but I was very shy, you know, it was -- and it had never been heard of during that time in [the] '60s that a 15-year-old, by the end of the film I was almost 16 and Leonard was 17, they were completely naked for their love scene."

14

### 3. Appellants Oppose the Motion to Strike[10]

Among other arguments, appellants contended they never consented to their nude scenes appearing in Criterion's 2023 release, which was enhanced compared to the previous versions.

### (a) Appellants Did Not Consent to the 2023 Version

Appellants argued the agreement they made about appearing nude in the film were with Zeffirelli himself, not BHE. They further argued nothing in Hussey's written contract required her to appear nude or to simulate intercourse.

### (i) Hussey's Understanding

Hussey submitted a declaration that nothing in the script or her contract required her to be nude during filming and she would not have agreed to participate—nor would her guardian have allowed her to participate—had there been such a requirement. "[A]t the very least," Hussey would have "demanded" the scene be performed by a body double. When Hussey discovered that Zeffirelli wanted her to act while nude in the bedroom scene, Zeffirelli told her "the nudity was not for photography, or display, but rather to enhance our performance of a very emotionally charged scene where the two newlywed lovers were, after a few moments of bliss, being forced to separate for an indefinite period of time." Zeffirelli also said that "if the

---

[10] Appellants' opposition to the motion appears to have been untimely. However, in ruling on respondents' motion, the court indicated it "considered the moving, opposition and reply papers." On appeal, respondents do not contend the court erred in doing so.

15

scene was not performed with both actors completely nude, the motion picture would be ruined because he would not be able to put his imprimatur on it and would not agree to its being released publicly." Hussey "reluctantly agreed to be naked for the performance, with the clear understanding that a make . . . or break condition of this would be that none of my private areas on my body would be photographed, that I always would remain covered by bedclothes during the performance, and that the performance would be done on a closed set, in full privacy."

After Hussey "was given to understand that photography had stopped," Whiting "began to cavort with some frivolity while [we] were still covered with the bedclothes which I recognized as an attempt to dispel the tension of the scene that was done while we were both fully naked under the bedclothes." Whiting "mounted" Hussey and began to simulate intercourse; Hussey "participated in the frivolity for the same reason: it seemed to relieve the tension of filming." Hussey later discovered she and Whiting "were being photographed during the frivolity." When confronted, Zeffirelli assured her "the photographs would never be made public: as part of the motion picture, or otherwise." When she later discovered that some of those photographs would be used in the movie, she discussed the issue with Whiting, and both "agreed that Zeffirelli was an artistic genius and that if we ever trusted anyone to use our most personal and private photographs in a way that enhanced our performances it would be Zeffirelli." Both thus granted him "permission to use those after taken photographs as he believed were necessary in his artistic judgment, to enhance the parting scene between Romeo and Juliet, on the condition that only he would make that decision now and in the future and that the consent was personal

16

to him and did not and could not extend to anyone else without each of our express consents."

### (ii) Whiting's Understanding

Whiting declared he did not believe he signed a written contract relating to his performance in the film. As to the bedroom scene, Whiting "was told that I would be fully and modestly costumed in flesh colored underwear and no private part of my naked body would be displayed, or photographed." Whiting "was not particularly hesitant to appear in the motion picture in a state of undress, or to perform an act of simulated intercourse, but I would have expected to be compensated considerably more highly if I agreed to give a performance of that nature." Near the end of filming, Zeffirelli informed Whiting that the bedroom scene should be performed in the nude "not to display our naked bodies, but to enhance our performance of the simulated intercourse scene that would only be subject to photography while we were both shrouded in the bedclothes." Zeffirelli informed him that if Whiting did not shoot the scene nude, "the motion picture would be ruined and all the work we had done to date would be rendered worthless because he would not put his imprimatur on the film." Based on his "extreme respect" for Zeffirelli, Whiting "accepted his assurances that the nudity was only to enhance the sense of a loving couple basking in post coital glow and was not going to be presented for prurience: no nudity would be displayed and no simulations of intercourse would be photographed, or included in the film."

After Whiting "was given to understand that the photography had ceased," he began to "cavort in what I now believe was a release of tension that had built up filming such a delicate scene. There was considerable ribaldry between myself

17

and the actor who portrayed Juliet in the scene, as well as with Zeffirelli.  Understanding that I was not being photographed, I playfully mounted the actor portraying Juliet and we pretended to have intercourse until I rolled off her and emerged, naked, from the bedclothes."

When Whiting learned that not only had "photography . . . continued during this ribaldry" and Zeffirelli "was considering using parts of that photography" in the movie, appellants discussed the matter and Whiting decided he had "sufficient trust in Zeffirelli's artistic abilities to be persuaded by his assurances that any use of them would only be to enhance the work and never to degrade it."  Whiting therefore "consented to Zeffirelli's exclusive use of those photographs of me with the clear condition that they would never be used by anyone else—in whole, or in part—without my express consent."

### (b) The 2023 Criterion Release Was Enhanced

Around the time appellants' first lawsuit was being dismissed, Hussey "learned from our then legal counsel that in February of 2023," Paramount and Criterion "released a version of Zeffirelli's film that contained copies of parts of the photographs taken surreptitiously after the bedroom scene filming had ceased."  Hussey claimed she "subsequently confirmed that . . . the release had been enhanced in a way to make those photographs appear to be of lewd and lascivious conduct, rather than an intimate love scene."  Because Zeffirelli had passed away in 2019, he could not have approved this version.  Hussey demanded Paramount "cease distributing the remake and to recall all versions of that remake it had released," but Paramount refused.  Hussey was "convinced . . . that

18

Paramount engineered that release to embarrass me in retaliation for my participating in the 2022 lawsuit against them."

Similarly, around May 2023, Whiting "learned from my legal advisors" that Paramount—through Criterion—had released "another production of the original filmed version of Romeo and Juliet that had been digitally enhanced and that accented the photographs, that I knew had been taken surreptitiously after my performance in the bedroom scene concluded in a lewd manner, such that they would embarrass me." Whiting "subsequently confirmed that information" and was "appalled" because, due to his death, Zeffirelli could not have approved of the 2023 version. Whiting thus demanded Paramount withdraw the new version of the film; Paramount refused.

### 4. Respondents' Reply

In September 2024, respondents filed a reply brief, pointing out much of the testimony in appellants' declaration contradicted the allegations in the operative complaint.

On the topic of consent, respondents argued that "Plaintiffs' declarations concede they gave their express consent to the bedroom nudity in all versions of the Film that existed at the time of Zeffirelli's death, and simply ignore the fact that the file of the Film used by Criterion was created in 2016 and thus existed at the time of Zeffirelli's death." Additionally, although Whiting claimed he did not believe he signed a written contract, "he does not purport to know whether a guardian signed one for him during his minority [citation], nor does he deny that he, too, would have been required to enter into his own contract in order to play 'Romeo' in the Film." Respondents contended that if

19

appellants mistakenly believed the written contracts did not cover nudity, they should have attempted to rescind the contracts long before they filed their lawsuit. Additionally, respondents asserted that appellants "ignore the concept of implied consent entirely" in their opposition.

On the topic of whether the 2023 Criterion Blu-ray release was enhanced, respondents argued appellants failed to rebut their evidence that the 2023 Criterion release had the same resolution as previous versions.

Along with the reply brief, respondents filed evidentiary objections to Hussey's and Whiting's declarations. Among other objections, respondents objected to Hussey's testimony that Criterion had released "a version of Zeffirelli's film that contained copies of parts of the photographs taken surreptitiously after the bedroom scene filming had ceased," and this version "had been enhanced in a way to make those photographs appear to be of lewd and lascivious conduct." They also objected to Whiting's testimony that he had "confirmed [the] information" he learned from his legal advisors (that Criterion had released "another production of the original filmed version of Romeo and Juliet that had been digitally enhanced"), and that the 2023 Criterion releases "contained the surreptitiously taken photographs" when "Franco Zeffirelli was no longer alive to approve the use of those particular photographs in the release." Among other objections, respondents asserted these statements lacked foundation and violated the best evidence rule, in that the testimony described the contents of an audiovisual work. The record does not disclose whether the trial court ruled on these evidentiary objections.

20

### 5.    The Court Grants the Motion

In October 2024, the court (Judge Holly J. Fujie) granted the anti-SLAPP motion. As to whether respondents' conduct constituted protected activity, the court found "all of the Plaintiffs' claims arise from the Defendants' distribution of the Film and inclusion of the Bedroom Scene" and "[i]t is well-settled that the production and distribution of a film is a protected activity for the purpose of anti-SLAPP law."[11]

As to the merits of the action, the court found initially that appellants' third cause of action for violating a United Kingdom statute was invalid because the statute "was completely repealed in 1989" and "the alleged acts took place after the repeal."

The court found the remaining claims "also fail because Plaintiffs cannot prove that they did not consent to the inclusion of the Bedroom Scene in the Film and its subsequent distribution, including the 2023 release of the Film." The court found that both Hussey and Whiting had entered into written agreements, granting BHE the "right to record products of the Artist's services hereunder and to include the same in the said Film and . . . for the purposes of exploitation, advertising, etc., by any and all means and by all media and for any other purposes the Company will require."

Even absent such express consent, the court found "Plaintiffs' subsequent conduct in the decades that followed since the Film's original 1968 release speaks to Plaintiffs' implied

---

[11] The court also found "Plaintiffs are barred from relitigating the issue of whether distribution of the Film is a protected activity" because of Judge Mackenzie's ruling in the first action.

21

ratification and approval of the Film, including the Bedroom Scene."

The court also found "unavailing" appellants' "attempt to distinguish between the prior releases of the Film and the 2023 release which is the basis of the present suit." The court rejected appellants' claim that "the 2023 re-release was digitally enhanced in such high definition and detail that the Bedroom Scene became impermissibly explicit," noting "[a] comparison of the 2023 release with the prior versions shows no significant visible improvement in the film, particularly in the Bedroom Scene, to the naked eye."

Appellants timely appealed.

## DISCUSSION

The anti-SLAPP statute requires a two-step analysis: "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. . . . If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.)

Appellants do not contend the trial court erred in its first-step analysis. As such, the burden shifted to appellants to submit "competent admissible evidence" demonstrating their claims have minimal merit. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940; see also *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) The trial court found they failed to do so. Appellants argue

the court erred because it: (a) impermissibly weighed conflicting evidence; (b) bucked a "judicial trend" of denying anti-SLAPP motions in cases involving use of personal images; and (c) used the wrong standard to evaluate whether appellants consented to the use of their nude scenes in the 2023 Criterion release.

"The grant or denial of an anti-SLAPP motion is reviewed de novo." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) Additionally, " 'our job is to review the trial court's ruling, not its reasoning.' " (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1002.)

### A.     *The Court Did Not Weigh Admissible Evidence*

In the second step of an anti-SLAPP analysis, "[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral v. Schnitt, supra*, 1 Cal.5th at pp. 384–385.)

After finding appellants could not demonstrate minimal merit on their third cause of action for violation of the Performers Rights Act of the United Kingdom because the alleged acts occurred after the repeal of this statute, the court concluded "[t]he rest of Plaintiffs' claims also fail because Plaintiffs cannot prove that they did not consent to the inclusion of the Bedroom Scene in the Film and its subsequent distribution, including the 2023 release of the Film."

23

### 1. Respondents' Evidence of Appellants' Consent

In their declarations opposing respondents' motion, appellants admit they consented to the inclusion of "the photos taken post performance" in the film but assert they conditioned that consent on the footage being used in a manner approved by Zeffirelli because they trusted his "artistic genius." In their motion to strike, respondents submitted evidence demonstrating this condition was met, because the 2023 Criterion release was based on the original 1968 film, which both Zeffirelli and appellants approved.

Specifically, appellants admit their operative complaint is based on the Blu-ray Disc that Criterion released in 2023 (which appellants term the "4K Digital Release"). Respondents submitted evidence that:

(1) In 1996, Paramount created a high definition master, with 1920 x 1080 resolution, from a 35mm interpositive version of the film.

(2) In 2007, a new 1920 x 1080 master was created from the 1996 master using a 1080p specification. This master was used for distribution to television broadcasters, cable and satellite television services, as well as video-on-demand services and streaming platforms, and was the basis for a 2013 Blu-ray Disc.

(3) In 2016, Paramount created an "HD 1080p preservation master" from the original film. Both the 2023 Criterion Blu-ray and 2023 Criterion DVD were created from this "preservation master."

(4) "Each restoration attempts to bring the Film's quality closer to the original that was displayed in movie theaters back in 1968. However, the Film as exhibited in movie theaters in 1968

24

remains the high watermark [*sic*] for picture quality and visual clarity."

(5) The only changes Criterion made to the preservation master Paramount provided were to "remove[] dirt and chemical stains, artifacts of age and wear on the original film materials" and "slightly darken[] the overall image to make it suitable for home video viewing." Criterion expressly declared it "did not edit, alter, add or delete scenes or parts of any scene or scenes from 'Romeo and Juliet' in any way at any time," nor did it "enhance, sharpen or otherwise affect the content or resolution any element or scene in the work." Criterion also confirmed the "Criterion Releases contain no 'computer generated, digitally enhanced' images, as plaintiffs allege. Nothing has been added or deleted, or 'enhanced' in some way. No scene or sequence has been modified or altered in any way. No part of the work has been edited to add or remove content. Nor is any part of the 4K Version rendered in the Criterion Releases 'in extreme[] high definition and detail,' as plaintiffs also falsely allege; indeed, the Releases are each rendered in significantly reduced resolution from the 4K master from which they were derived, but are otherwise faithful reproductions of the same in all respects."

## 2. Appellants' Contrary Evidence

Appellants contend they presented contrary evidence, which the court was required to accept. Hussey averred that Criterion "produced and released a version of Zeffirelli's film that contained copies of parts of the photographs taken surreptitiously after the bedroom scene filming had ceased" and that she "subsequently confirmed that . . . the release had been enhanced in a way to make those photographs appear to be of lewd and lascivious conduct, rather than an intimate love scene." Whiting

25

similarly declared that he "confirmed" Criterion released "another production of the original filmed version of Romeo and Juliet" that had been "digitally enhanced and that accented the photographs, that I knew had been taken surreptitiously after my performance in the bedroom scene concluded in a lewd manner." He deemed the new version a "remake" that "contained the surreptitiously taken photographs," when "Zeffirelli was no longer alive to approve the use of those particular photographs." Respondents objected to this testimony as lacking foundation and violating the best evidence rule in that they described the contents of an audiovisual work.

### 3. The Court Could Disregard Appellants' Evidence

"[A]t the second stage of an anti-SLAPP hearing, the court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial. Conversely, if the evidence relied upon *cannot* be admitted at trial, . . . the court may not consider it in the face of an objection." (*Sweetwater Union High School Dist. v. Gilbane Building Co.*, *supra*, 6 Cal.5th at p. 949.) Thus, "[a]lthough ' "the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the [anti-SLAPP] motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." ' " (*Kenne v. Stennis* (2014) 230 Cal.App.4th 953, 962–963.)

Here, respondents submitted evidence demonstrating the existence of the conditions that appellants contended were required for their consent—the 2023 Criterion release contained

the same content and was of no higher resolution than previously released versions of the film, which appellants had consented to.

In attempting to controvert this evidence, appellants submitted no expert declarations of their own, describing how the 2023 Criterion release was materially different from the previous releases, either in content or in resolution. They neither objected to respondents' declarations nor explained why the testimony therein was wrong or irrelevant. They pointed to no scene that was newly inserted into or deleted from the 2023 Criterion release, no shot they contended was altered, no frame they could demonstrate was digitally enhanced. Instead, appellants' declarations averred that they "learned" from legal counsel that respondents had released a "remake" or new "version" of the film where the nude scenes were digitally enhanced, and subsequently "confirmed" this information. They explained neither how they confirmed this information nor the basis for their knowledge to make these statements. Thus, especially in the face of respondents' evidence demonstrating the impossibility of the conclusions appellants reached regarding the 2023 Criterion release, the trial court did not err in disregarding appellants' conclusory testimony. (See Burke, Cal. Practice Guide: Anti-SLAPP Litigation (The Rutter Group 2025) (Rutter Anti-SLAPP) § 5:23 ["Evidence that lacks a proper foundation may be excluded in connection with an anti-SLAPP motion"], citing *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444 and *Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1372.) Nor did the court err in reviewing materials that it was asked to judicially notice without objection. (Rutter Anti-SLAPP, § 5:28 ["An anti-SLAPP motion or an opposition to an anti-SLAPP motion may be supported by facts that a court may

27

judicially notice"], citing Evid. Code, § 452; *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 676; *Sexton v. Apple Studios LLC* (2025) 110 Cal.App.5th 183, 193–194.)

We find instructive the case of *Guracar v. Student Loan Solutions, LLC* (2025) 111 Cal.App.5th 330, which respondents cited in their brief, but which appellants failed to address in their reply.  In *Guracar*, the cross-complainant "alleged that [cross-defendant] SLS violated the Debt Buyers Act by failing to make required disclosures in its initial written communication." (*Id.* at p. 355.)  "The trial court held that Guracar failed to show a probability of prevailing on this cross-claim because SLS presented uncontroverted evidence that, in fact, its initial communication contained the required disclosures." (*Ibid.*)[12]  On appeal, the cross-complainant pointed to "his declaration averring that the first communication he received from cross-defendants was in June 2022," and "assert[ed] that the trial court erred in weighing the competing evidence and concluding that the November 2017 letter was SLS's first communication to him." (*Id.* at p. 356.)  The appellate court disagreed, holding that "[a] party opposing an anti-SLAPP motion cannot show a probability of prevailing in the face of contrary evidence presented by the moving party without controverting that evidence" and that cross-complainant's declaration failed to "raise a triable issue concerning whether SLS made the initial disclosures required by the Debt Buyers Act." (*Ibid.*)

---

[12] The evidence was "a letter dated November 21, 2017, contained the statutorily required disclosure of the debtor's right to request various records." (*Guracar v. Student Loan Solutions, supra*, 111 Cal.App.5th at p. 355.)

28

Similarly, appellants cannot create a triable issue of fact concerning whether the 2023 Criterion releases were materially different in content or resolution from previous, approved versions of the film solely by submitting conclusory declarations stating they were.  In short, the court did not "weigh" appellants' evidence against respondents' evidence:  appellants presented no admissible evidence to counter respondents' evidence.[13]

---

[13] Appellants also contend throughout their appellate brief that, unlike previous versions, the 2023 Criterion release "enables frame-by-frame pausing, high-resolution screen capture, and instantaneous global dissemination," "is the first and only one that viewers can keep permanently and watch on their own outside of the theater," and "is available . . . through Internet streaming platforms."  But the only evidence appellants cite for these claims are appellants' declarations or pleadings—none of which contains competent evidence supporting these propositions.  (For example, in support of their contention that "[t]he 4K Digital Release premiered on February 14, 2023 on 4K Ultra-HD Blu-ray and torrent streaming platforms worldwide," appellants cite to paragraphs 11 through 14 of their original, unverified complaint.  Not only is an unverified complaint not evidence, but the original complaint was superseded by the amended complaint.)

Further, some of appellants' claims are verifiably false.  For example, although appellants claim the 2023 Criterion release was the first and only version "viewers can keep permanently and watch on their own outside of the theater," respondents asked the court to judicially notice (apparently without objection) a 2000 DVD and a 2013 Blu-ray Disc, both of which a viewer can keep permanently and watch outside of the theater.

## B. *The "Judicial Trend" Is Irrelevant*

Appellants argue we should follow the courts in *Belen v. Ryan Seacrest Prods., LLC* (2021) 65 Cal.App.5th 1145 (*Belen*), *Hilton v. Hallmark Cards* (9th Cir. 2010) 599 F.3d 894, 899 (*Hilton*), and *Young v. NeoCortex, Inc.* (C.D.Cal. 2023) 690 F.Supp.3d 1091 (*Young*) and reverse the granting of the anti-SLAPP motion. All of these cases are inapposite.

In *Belen*, the plaintiff alleged she neither knew nor consented to the defendants filming her nearly naked body. (*Belen*, *supra*, 65 Cal.App.5th at p. 1151.) In *Hilton*, the plaintiff "sue[d] a greeting card company for using her image and catchphrase in a birthday card without her permission." (*Hilton*, *supra*, 599 F.3d at p. 899.) In *Young*, the plaintiff sued the developer of an application that permitted users to swap their face with that of a celebrity because the developer used the plaintiff's image in this application without his consent. (*Young*, *supra*, 690 F.Supp.3d at p. 1096.)[14] In short, unlike the instant

---

[14] Appellants also cite *Dae v. Traver* (2021) 69 Cal.App.5th 447 for the proposition that "[c]ourts will deny an anti-SLAPP motion where there is a disputed issue that raises public policy concerns." *Dae* dealt with a trust's no-contest clause, and whether a beneficiary's challenge to the actions of a trustee constituted a contest. (*Id.* at pp. 450–451.) The court held that, for the plaintiff to prove his claim that the challenge was a contest, he was required to prove the challenge was frivolous, and the evidence he provided to do so was sufficient to survive an anti-SLAPP motion. (*Id.* at pp. 462–464.) The court did not hold that a court should always deny an anti-SLAPP motion when a disputed issue raises public policy concerns.

30

case, none of these cases involved plaintiffs who consented to have their images used.[15]

### C. *The Court Did Not Err in Finding Appellants Consented*

Finally, appellants argue the court "failed to evaluate the legal standard for consent that applies to each of the asserted causes of action." Specifically, "the court did not entertain the possibility that Appellants' consent may have been invalid even if Respondents believed—reasonably or otherwise—that the 4K Digital Release was based on valid consent." Although it is not entirely clear, it appears appellants contend their initial consent "may have been invalid" because "[t]he original consent was not even given by the teenagers themselves, as they lacked the legal capacity to consent" but was "instead given by the actors' respective guardians, who certainly did not contemplate at that time the extent to which advanced technology could be used to expose and humiliate their children for years and decades."

As discussed above, both appellants have declared they consented (and continued to consent) to the inclusion of their nude scenes in the film, so long as the inclusion was done in a manner approved by Zeffirelli.[16] The undisputed, admissible

---

[15] Appellants also argue that "a contract authorizing the commercial distribution of intimate images of minors without consent may be unenforceable as against public policy." Whether or not this is true, as discussed above, the commercial distribution represented by the 2023 Criterion release occurred with appellants' consent.

[16] Appellants' citation to *Del Amo v. Baccash* (C.D.Cal., July 15, 2008, CV 07-663 PSG) 2008 U.S. Dist. Lexis 93913 is thus
*(Fn. is continued on the next page.)*

31

evidence demonstrates the 2023 Criterion release contained the same content and resolution as previously approved releases—which were lower resolution than the original 35mm version—with no edits or relevant enhancements.  As such, the court did not err in finding appellants consented to the inclusion of their nude scenes in the 2023 Criterion release and thus could not demonstrate the minimal merit required for the second prong of the anti-SLAPP analysis.[17]

## DISPOSITION

The court's order is affirmed.  Respondents shall recover their costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

BENDIX, Acting P. J.          WEINGART, J.

---

inapposite.  There, it was undisputed the plaintiff did not consent to the use of his photographs, and the question confronting the district court was whether the plaintiff was required to prove the defendant knew he lacked the requisite consent.  Here, appellants consented to the use of the Objectionable Photos.

[17] As we conclude the trial court did not err in granting respondents' anti-SLAPP motion because the uncontroverted evidence demonstrates the existence of the conditions appellants asserted were required for their consent, we need not address respondents' other arguments for why appellants' claims lacked merit.